Excuse me, the next case called for oral argument is Haake v. Wehking. May it please the court. Counselor. I'm Jane Longer. I represent Lindsey Haake. This is on a custody matter. Both parents, mom and dad, filed petitions to modify custody of their 5-year-old daughter, Lindsey. They were divorced in 2009. A joint custody order was entered. There was no primary custodial parent. Physical custody was agreed to by the parties. If the parties could not agree, then it was 50-50 physical custody. Dad, however, had mom watch Lily on his Mondays, and he had maternal grandmother watch his Lily on his Tuesdays. And that continued until mother filed her petition to modify. Then dad would no longer allow mom or grandma to watch Lily on Mondays and Tuesdays. After a contested trial, the trial court designated dad as the primary residential custodial parent. The trial court stated that this case was not close, but rather it was razor thin. We disagree with that. Now, I'd like to go through the statutory factors, but before I do that, I would like to address the tender years doctrine. The trial court made a point in stating that the tender years doctrine has long been rejected by the courts. We could not agree more. We did not advocate, we did not argue the tender years doctrine. We understand that that has been rejected by the courts. The trial court based its reference to the tender years doctrine on mother's partial answer when she was asked why she should get custody. She said, Lily is a vulnerable, impressionable, 5-year-old little girl who needs her mother. That was her partial answer. But then mom continued in the same answer with, I think she needs to be with a role model that shows her how to be a lady, how to have manners, how to deal with feelings and emotions. She needs to be nurtured and loved by her mom. She needs to have a stable family home life. She needs to be able to talk about girl things with mom and have that close relationship and family stability. So it's clear that mom's answer was not intended to invoke the tender years doctrine, but rather she talked about the stability factor, and that is the one factor that the court weighed heavily in this matter. With regard to the statutory factors, the trial court talked about the statutory factors. The trial court favored mom with two of the factors, favored dad with two of the factors, three of the factors the court said was a wash, and two did not apply. When discussing these factors, the trial court stated, I quote, the factor upon which this court places the greatest weight is stability, and this factor overwhelmingly favors Jeffrey. The trial court also stated that Lily has lived her first five years in the house where Jeffrey continues to reside. Lily was nine months old when the parties divorced. Mother had Lily more than 50% of the time since the divorce and until she filed her petition to modify in early 2013. She then moved to Foresight in early 2013, and she had Lily 50% of the time. At no time since Lily was nine months old did she ever spend more than 50% of the time in dad's house. Now at the time of trial, dad was working at the Murray Center, and I know we're all familiar that the governor had proposed a closure date on the Murray Center. Dad had applied for approximately 22 jobs around Illinois and even out of state in Florida. Dad was asked, so basically bottom line is you don't know where you're going to go, correct? Dad answered, I guess I can't predict the future. I don't know what the answer is to that, ma'am. Now some weeks dad works seven days, seven day period, 24 hours a day. He's on call. He could have to leave Lily at 2, 3, 4 in the morning. He said that he'd call his mom first. If she wasn't available, he would call his father to come and stay with Lily. So when Lily goes to bed at night when she's with dad, she doesn't know who's going to be there when she wakes up. And it takes dad's, the grandfather, it takes about an hour to get there to stay with Lily. Mom's husband is Nick. He's a firefighter and he's an EMT. He's been in Forsyth for seven and a half years. His job and his, and his location is as stable as it can get. We don't move or close or relocate fire departments. They stay in the community where they're, they protect. Now mom and Nick own their own home in Forsyth. Mom is available to take Lily to school each and every morning. She has great flexibility in her job. She's a hairdresser and she negotiated with her boss before she accepted the job that she has a child. She needed great flexibility. There was testimony that she can leave anytime at the drop of a hat if she needs to due to Lily's needs. She even took a couple of weeks off that job when Lily started kindergarten to get Lily acclimated to kindergarten. She's always rearranged her schedule to fit Lily. When Lily was going to preschool, mom quit her temporary CPA job to stay with Lily and to participate in her preschool and spend more time with her. Mom has picked Lily's doctors and took her to most of Lily's doctor appointments until she filed this petition to modify custody. And then dad became more involved. Now the factor upon which trial court placed the greatest weight and said that it overwhelmingly favored dad was the stability factor. There are several issues on stability that I'd like to address. The first one, the job future. Mom, very stable. Dad, unknown. Second one, future school district. Mom's is certain and there was testimony what an excellent school district this was and that people even moved to Forsyth so their kids can go to the Forsyth school district. Dad, unknown because we don't know where he's going to be employed. The third one, marital status. Mom is married. Dad is divorced and I believe he testified he broke up with his then girlfriend three to four weeks before this trial started. Future daycare. Mom's is known, dad's is unknown. Flexibility. Mom negotiated with her boss before she accepted the job that she could be flexible, have flexible hours. Dad can be on call seven days at a time, 24 hours a day. The physical violence. Mom has none, neither has her new husband. No physical violence. Dad has had numerous incidents of physical violence in the past, including mom's testimony that he was, he headbutts her. He, uh, he left red marks on her neck that was corroborated by another witness who heard mom yell, dad screaming at mom and mom say no, stop. And then saw mom visibly shaken, crying and upset. Um, mom testified he grabs her by the back of the head. Uh, he throws things and he, he punched a hole in the door and I believe he even admitted that he had a crack, put a crack in the door. In any event, then there's the drinking and the DUIs. Mom has none. Dad has had a DUI and there's also a testimony that he has a bar in his basement and there's a hole in the carpet from a bong or a hookah or something that tipped over and burned a hole in the carpet. Um, several witnesses testified to dad's drinking. And then suicide threats. Mom has no suicide threats. Mom testified that dad threatened suicide at least three times. Now clearly the stability factor in this case should have favored mom by far. There can be no stability if you have no control over your future employment. Dad was applying all over Illinois and even, even out of state for jobs. Um, so stability is a very issue the trial court said overwhelmingly favored dad. The court's ruling was clearly against the manifest weight of evidence and factor number four, the child's adjustment to her home community school should have been favored, in favor of mom. The only other factor that the court found favored dad was factor number three, the interaction of the child with the parents and others. Um, dad introduced exhibit D, a map of the family proximity in the trial court. Um, and that was to Centralia area. Now this map was meant to and I think it did deceive the trial court. Most of the relatives on the map had little to no contact with dad or with Lily. For instance, Uncle Howard and Aunt Sharon only see Lily in passing. Rodney only sees Lily twice a year. Dad testified that they would get together with that side of the family an average of zero times a year as a group. Dad said they had never been to the house of his cousin in Breeze. They've never been to New Baden to his cousin Chris's house who's on the map and they don't visit the relatives in Troy. The map was a total misrepresentation. Now even though the maternal grandparents live in Centralia, dad eliminated their interaction with Lily when mom filed her petition for modification. He will no longer let grandma keep Lily on Mondays or Tuesdays. Um, he won't let mom keep Lily on Mondays or Tuesdays since she filed her petition. Now maternal grandmother testified that she has been the primary daycare provider for Lily since Lily's birth. Now these grandparents, the maternal grandparents now go to Forsyth to visit with Lily and their daughter on weekends. And they even testified that they are considering moving to Forsyth in a year or two when grandpa retires. Um, dad is not watching out for Lily's best interests. He's using Lily like a pawn when he doesn't like something. He's punishing the grandparents and the mom. Um, the witness I believe she testified that she worked with dad. She overheard dad saying that the maternal grandparents were going to pay and that they would suffer. Well, he has proved that by taking grandma's days away with Lily. Now this further reduces the circle of extended family support in the Centralia area by not allowing maternal grandparents to see this child. And the circle has already proven to be quite hollow when you look in detail at all these relatives that are purporting to be in the area. So they were the two factors the court decided in favor of dad. I'd like to talk about the two factors that the court said was awash. One is five, the mental and physical health of all individuals involved. The trial court said that's awash. Favors neither. However, dad's threatened suicide three times, has a violent temper, throws things, grabs mom. Um, he grabbed her by the throat, slammed her into the wall while she was holding Lily. Now dad denies that, but there was a witness that came to the door because mom does hair at her house and she brought her daughter to get her hair done. And the witness testified, yes, she heard mom ask dad to stop. Excuse me. When she went to the door, when mom answered the door, she was crying, she was visibly upset and shaking. Um, the witness further testified that when her daughter was getting her hair done, dad kept coming in and out of the salon. She thought to make sure mom wasn't telling anything. She said that she would no longer allow her child to go to the house without her. Water right there. Thank you. Dad has an alcohol abuse problem. He told mom he was going to get anti-anxiety medicine when he heard that Mary's center was closing. Now this, this does not sound like a man who handles stress very well. Mom, on the other hand, has no mental health problems. Um, the next factor the court said was awash was the willingness to facilitate and encourage close relationship with the other parent. Again, dad took his Monday and Tuesdays away from mom and grandma out of spite when mom filed her petition to modify. Um, dad had until December to get a vision test, a vision screening for Lily. But he scheduled the vision screening the very first day that kindergarten started in Foresight, when Lily was to attend kindergarten in Foresight. That's when he scheduled the vision screening. He refused to change weekend visitation with the mother until she agreed to give him a China cabinet that she was awarded in the divorce. Mom, on the other hand, mom and Lily get dad birthday presents. Mom sends him pictures of Lily. They include dad in their evening prayers basically. Thank you. Thank you. Also, thank you. Good morning. I represent Jeff, the father, the belly in this matter. Um, this is a custody case, and that's all that it is. If you're a custody case, this case is nothing to do with there are no procedural issues. There are no misinterpretation of the law issues here. It is purely factual, purely credibility of witness concept from the court's perspective. In addition to the two witnesses, there are the two parties. There were 10 witnesses that testified to these numerous incidents over two days. Five of them were for the dad, five were for the mom. The point of this case is this is purely factual. I can't stand up here and argue facts again. This is not the place to re-argue the facts. Very quickly and very specifically, some of the facts, quote-unquote facts, that counsel is suggesting are not facts at all. They were just testified to from her client. There are an equal number of responses from my client with respect to the facts mentioned, for example. And I don't want to go into facts because I don't think this is appropriate for that purpose. Strangely enough, this is purely a factual case about witnesses and weighing up the testimony. Physical violence issues, the myriad of the responses. Dad's father denied it and he denied it. One of his quotes was, yesterday was the first time I ever heard that story in my life. That was a testimony that dad gave at trial and the court heard it and the court weighed it. So the facts suggested by the other party are merely testimony. The record and the briefs indicate what the parties talked about. What did mom talk about? That was alluded to in the oral argument just a couple of minutes ago. Mom talked about dad. How terrible dad is. The court specifically said mom tried to characterize dad as a drunken, abusive monster and that she fed him. The couple of little facts that were mentioned, New Year's Eve party. Well, here's the response to that. Mom was at the New Year's Eve party. Dad had a beer at the New Year's Eve party. How do those facts mean custody with respect to a little girl? Those are the things that the court had already considered. What did dad talk about? What did dad testify to and what was in his brief? Dad talked about the girl. He talked about his interaction and relationship with the girl over the last four years. Example on page 9 of my brief. Centralia History Museum, Hands Around Murray Center. Daughter rang bells with him for charity. The child's dentist, eye doctor, health insurance, pediatrician, all are local. That's what dad talked about. Dad talked about counseling. He talked about the child going to church, reading to the child. And he gave tangible examples of his interaction with the child. I'm not going to go into that tangible example because the point is the trial court already heard those and already made their decision on those things. Mom talked about how bad dad was and about what mom's going to do in the future. This is a speculation concept because mom takes the position that dad might have a different job in the future and therefore stability may not exist in the future. So mom's argument seems to primarily be about how bad dad is and the witnesses disagree with that and how great things will be with mom in the future. By the way, after a lot of these, as a matter of fact, all of the abuse issues occurred before the divorce and after the divorce the parties got back together for about five months. There was a period of reconciliation after mom dated someone for a bit, got back together with dad, dated somebody else, and is now married again. So the two arguments with respect to that are this voluntary reconciliation sort of eliminates these complaints that are now convenient to mom. And it is correct and I agree that stability was and is a very important part of a girl's life. The stability that mom is trying to portray or rely on is with respect to the future because her brief inter-testimony said I'm stable because I just moved to northern Illinois and I'm stable because I just got a house and I'm stable because I just signed my daughter up for all these things that have now occurred after this petition was filed, the modification of custody or the determination of custody. So her stability is based on, again, the future. The only tangible issue with respect to physical violence, which was frankly one of my concerns, is after dad found out mom was having an affair, and this was, again, yes, the child was nine months old, put hands on mom's shoulders. Now, in my brief, I referenced that, and I don't condone it, but I want to make it real clear. I said that was in the realm of expectancy. That's the only physical altercation that was referenced. Now, it's important to remember that in all of these issues, no effect on the child, no effect on Lily whatsoever. In fact, most of these issues, Lily wasn't even present or she was an infant because when the parties separated, she was nine months old or a year old. So this evidence with respect to what they were trying to create that dad is a violent monster occurred not only at a time when the girl was small, a time when the girl didn't know anything about it, no evidence that there were any negative effects on the girl at, certainly voluntary, reconciliation tends to eliminate a lot of those concerns. Here's an example, anti-anxiety medicine. Another example of what mom, the straws on which mom was grasping. Dad took Lexapro. When did he take it? 2004, years before the child was ever born, to get on a plane for the first time they'd ever flown to their honeymoon. That wasn't the time that he took the medicine. The record said in their arguments, and that is just an example of the myriad of additional facts that the court considered to weigh all of these things. Unless the court's got any questions, that's all I have. I don't believe so. Thank you. Mom agreed to reconcile with dad on the condition he'd go to counseling. Dad went to one counseling session, refused to go again, and that's when they broke up. The trial court based its decision primarily on stability in Centralia, the child's stability in Centralia. But dad applied for jobs all over Illinois and even out of state. The court's determination of Centralia being stable was pure speculation. Dad couldn't predict the future of where he was going to be and where he was going, and neither could the trial court. We don't know where dad's going, where he's going to be. Mom established a stable residence in Forsyth with her husband, who's been there seven and a half years. They have no intention of moving. Mom is the one who can provide stability for Lily, not dad. I agree with Nelson that this case is factual. It's very factual. And the facts show that the statutory factors that favor mom are factor 3, 4, 5, 6, 7, and 8, not just 6 and 7. The facts of this case make that razor-thin position of the trial court unjustifiable. Now, with regard to the physical violence, dad's own mother testified that she saw a dent in the door that's about the size of a fist. Dad admitted he put a crack in that door. Dad admitted he put his hands on mom's shoulder. And then you have Kathy Nearing, a social worker, who heard mom scream, no, Jeff, or stop Jeff. And physical violence had no effect on Lily. I beg to differ. Mom was holding Lily when dad slammed her against the wall and choked her and left red marks on her neck that the social worker saw. Lily was there, I believe, when dad put the crack in the door. I believe there was testimony that she was in her high chair in the kitchen. On the statutory factor 8, the willingness to facilitate a good relationship with the other parent, mom and Lily would get birthday presents for dad. They would include dad in their evening prayers. They would bake cookies for dad. Mom would send pictures of Lily to dad. Mom gave extra time to dad at Christmas. She gave him time to take Lily to Chicago to visit his stepsister. She took Lily to his work when the helicopter went there. She invited him and his then-girlfriend to Lily's birthday party along with his father and his father's wife. Clearly, this factor should have favored mom and should not have been a wash between mom and dad. The time that this mother spent preparing Lily to begin kindergarten and the quality time that she had spent with Lily was extensive. This was both before and after the parties filed their petitions. Again, the facts show that the statutory factors heavily favor mother based solely on the facts of this case. Thank you. Thank you, counsel. We appreciate the briefs and arguments. Counsel will take the case under advisement. Thank you.